Aym Techs., LLC v. Rodgers, 2019 NCBC 63.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

AYM TECHNOLOGIES, LLC,

       Plaintiff,

v.

GENE RODGERS, SCOPIA
CAPITAL MANAGEMENT LP, and
COMMUNITY BASED CARE, LLC,

       Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16-CVS-21788

**ORDER AND OPINION ON
PLAINTIFF'S MOTION TO
SUPPLEMENT THE SUMMARY
JUDGMENT RECORD, DEFENDANTS
SCOPIA CAPITAL MANAGEMENT LP
AND COMMUNITY BASED CARE,
LLC'S MOTION FOR SUMMARY
JUDGMENT, AND DEFENDANT
GENE RODGERS'S MOTION FOR
SUMMARY JUDGMENT**

1.    **THIS MATTER** is before the Court on the following motions in the above-captioned case: (i) Plaintiff Aym Technologies, LLC's Motion for Leave of Court to Supplement the Summary Judgment Record ("Motion to Supplement the Record"); (ii) Defendants Scopia Capital Management LP and Community Based Care, LLC's Motion for Summary Judgment; and (iii) Defendant Gene Rodgers's Motion for Summary Judgment (collectively, the "Motions").

2.    The Court, having considered the Motions, the briefs in support of and in opposition to the Motions, and the arguments of counsel at the hearing on the Motions, hereby **GRANTS** the Motions and dismisses Plaintiff's claims with prejudice.

*Wilder Pantazis Law Group, by Raboteau T. Wilder, Jr., Jefferson Moors PLLC, by Jefferson A. Moors, and Rayburn Cooper & Durham, PA, by G. Kirkland Hardymon and Benjamin E. Shook, for Plaintiff Aym Technologies, LLC.*

*Bell Davis & Pitt, PA, by Joshua B. Durham, Edward B. Davis, and Jason B. James, for Defendant Gene Rodgers.*

*Pollack Soloman Duffy, LLP, by Barry S. Pollack, and Ogletree, Deakins, Nash, Smoak & Stewart, PC, by Benjamin R. Holland and Lia A. Lesner, for Defendants Scopia Capital Management LP and Community Based Care, LLC.*

Bledsoe, Chief Judge.

I.

FACTUAL BACKGROUND

3.      The Court does not make findings of fact on motions for summary judgment. *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975).  Rather, the Court summarizes the relevant evidence of record, noting both the facts that are disputed and those that are uncontested, to provide context for the claims and the Motions.  *Id.*

4.      This action arises out of Plaintiff Aym Technologies, LLC's ("Aym" or "Plaintiff") contention that Defendant Gene Rodgers ("Rodgers"), while an independent contractor of Aym, acted duplicitously and in derogation of his contractual duties to Aym by helping Defendants Scopia Capital Management LP ("Scopia") and Community Based Care, LLC ("CBC") acquire North Carolina healthcare providers that Rodgers knew Aym was interested in acquiring under its confidential acquisition plan—a plan Aym claims it shared with Rodgers under a non-disclosure agreement and which Aym contends Rodgers subsequently shared with Scopia and CBC without Aym's consent.

5.      Aym is engaged in the business of providing its comprehensive management software—"OnTarget"—primarily to the North Carolina Medicaid intellectual and

developmental disability ("IDD") industry. (Am. Aff. Lewis Quinn ¶ 6 [hereinafter "Quinn Aff."], ECF No. 152.) According to Aym, OnTarget is "a suite of programs which enable[s] providers to do everything that [i]s necessary to operate in the Medicaid environment[,]" (Quinn Aff. ¶ 6), and includes functions for "payroll, time keeping, medical record storage, generat[ing] reports which could be used to prepare . . . tax returns, maintain[ing] the required clinical documentation, and submit[ting] electronic billing which complie[s] with Medicaid regulations[,]" (Quinn Aff. ¶ 7).

6.     Rodgers is a North Carolina resident working in the IDD industry. Aym entered an Independent Contractor Agreement ("ICA") with Rodgers dated April 1, 2009. (Ex. D Rodgers Aff. [hereinafter "ICA"], ECF No. 113.) Under the ICA, Rodgers agreed, on a nonexclusive basis, to "market/sell products produced by" Aym and consult with Aym "on various matters including but not limited to, the development of marketing plans and information, setup and creation of a national sales force, and other sales related activities." (ICA 2–3.) At the same time Rodgers was working for Aym as an independent contractor, he worked full time, first at Universal Mental Health Services, Inc., where his responsibilities included "roll[ing] up small agencies into Universal[,]" (Aff. Gene Rodgers ¶ 4 [hereinafter "Rodgers Aff."], ECF No. 109), and later, beginning in 2011, as the Mergers and Acquisitions Director for Providence Services Corp., (Rodgers Aff. ¶ 5).

7.     Aym asserts that beginning in 2013, Aym's goal was to take advantage of a perceived market opportunity to purchase and vertically integrate certain customer IDD providers in North Carolina and implement its OnTarget software among the

purchased entities to create one large dominant provider in the North Carolina IDD industry. (Quinn Aff. ¶ 22.) Aym claims that it was in a unique position to identify and respond to changes then occurring in North Carolina's IDD industry, (Quinn Aff. ¶ 10), because Aym determined, based on customer information it accessed through its OnTarget software, that providers were struggling under increasing regulatory pressures, provider-owners were increasingly eager to sell their companies as they reached retirement age, and Aym's customers' businesses were financially volatile, (Quinn Aff. ¶¶ 12–18). What Aym claims it had and its competitors did not was "clarity regarding the difficulties providers were experiencing," and "knowledge of what the OnTarget software could bring to bear to correct these problems[.]" (Quinn Aff. ¶ 19.)

8. Aym contends that to capitalize on this perceived market opportunity, it developed a written "Vertical Integration Strategy Plan" (the "Plan"). (*See* Quinn Aff. ¶ 25; *see also* MSJ-8 Dep. Ex. 66 [hereinafter "Plan"], ECF No. 106.) According to Aym's CEO, Lewis Quinn ("Quinn"), the Plan describes "how to identify targets for acquisition," the "idea to start with a foundation company and thereafter acquire smaller targets," and how "to finance the acquisitions." (Quinn Aff. ¶ 25.)

9. In early August 2013, Quinn persuaded Rodgers to assist in the acquisition of IDD providers in North Carolina. (Quinn Aff. ¶¶ 36–38.) Quinn avers that he disclosed the Plan to Rodgers at that time, (Quinn Aff. ¶¶ 36–38), allegedly relying on the confidentiality provision in the ICA, which provided that Rodgers must not

disclose "any information not generally known to the public about [Aym], and [Aym's] Customers and Vendors," (ICA § 1.01).[1]

10.   Scopia provides investment management services to Scopia HCM Partners, LLC ("Scopia HCM"), which in turn owns CBC, a holding company formed in 2015 to provide services to the North Carolina IDD market through wholly owned subsidiaries. (*See* Ex. 1 Decl. Lia Lesner ¶¶ 2–3, ECF No. 52.3.) The Court previously dismissed all claims against Scopia HCM. *See Aym Techs., LLC. v. Rodgers*, 2018 NCBC LEXIS 14, at *53–54 (N.C. Super. Ct. Feb. 9, 2018).

11.   While the parties contest whether he was permitted to do so, it is undisputed that Rodgers assisted Eddie Hughes, the owner of North Carolina IDD provider Hughes Behavioral Services ("Hughes"), and Rankin Whittington ("Whittington"), the owner of North Carolina IDD provider Home Care Management ("HCM"), in the sale of their businesses by introducing them to prospective buyers, including Defendant Scopia and its affiliates. (Rodgers Aff. ¶¶ 7, 19.) It is also undisputed that at the time Rodgers made these introductions, he had known both Eddie Hughes and Whittington for many years through interactions unrelated to Aym. (Rodgers Aff. ¶¶ 7, 19.)

12.   Aym claims that the Plan identified HCM for Aym's potential acquisition, (Quinn Dep. Vol. II 119:7–23), and that Rodgers was aware that Aym was interested

---

[1] It is undisputed that as of the ICA's April 1, 2009 effective date and continuing into 2013, Aym was engaged only in providing software products and services in the IDD industry and had not yet developed the Plan. (MSJ-2 Dep. William Grubb 8:19–21, ECF No. 100; MSJ-4 Dep. Lewis Quinn 85:21–24 [hereinafter "Quinn Dep. Vol. II"], ECF No. 102.)

in purchasing Hughes, (MSJ-3 Dep. Conf. Lewis Quinn 151:16–17 [hereinafter "Quinn Dep. Vol. I"], ECF No. 101), and Lindley Habilitation Services, Inc. ("Lindley"), (MSJ-1 Dep. Douglas Finley 32:17–33:10 [hereinafter "Finley Dep."], ECF No. 99).[2] It is undisputed that Aym attempted to purchase HCM on two occasions, first in 2013 and again in 2014–15, but was unsuccessful. (*See* Quinn Aff. ¶¶ 40, 42–44). It is also undisputed that Aym tried but failed to acquire Lindley in 2015. (MSJ-5 David Swintosky Dep. 133:20–135:13 [hereinafter "Swintosky Dep. Vol. I"], ECF No. 103.) Similarly, the undisputed record shows that, although Aym was in negotiations to purchase Hughes in this same timeframe, Aym and Hughes were never able to reach a final agreement. (Finley Dep. 76:19–77:19, 94:25–95:10.)

13. Separately from Aym and its acquisition efforts, Scopia and CBC began exploring potential acquisition opportunities in the North Carolina IDD market at the beginning of 2015. (Ex. 15 Aff. Raboteau T. Wilder, Jr. 7:16–9:18 [hereinafter "Wittels Dep."], ECF No. 153.1.) Thereafter, Scopia successfully purchased HCM on July 17, 2015, (*see* Ex. 10 Decl. Barry Pollack, ECF No. 119.1), Hughes in September 2015, and Lindley in 2016, (Rodgers Aff. ¶¶ 19, 21). Aym contends that Scopia and CBC were only able to succeed in acquiring HCM, Hughes, and Lindley because Rodgers disclosed the Plan to Scopia in violation of the ICA's terms and the North Carolina Trade Secret Protection Act.

---

[2] Although Aym also asserts that Hughes and Lindley "were targets that specifically met Aym's criteria and . . . [that] Aym had discussed [Hughes and Lindley] in detail with Rodgers[,]" (Pl.'s Br. Opp'n Defs. Scopia Capital Mgmt. LP & Cmty. Based Care, LLC's Mot. Summ. J. 12 [hereinafter "Br. Opp'n Scopia/CBC Summ. J. Mot."], ECF No. 154), Aym did not support this contention with record citations.

14.    In July 2015, after Scopia acquired HCM and CBC was formed, Quinn sought to sell Aym to Scopia, advocating for the roll up and vertical integration of Aym with HCM and other IDD providers that Scopia or CBC intended to identify and acquire in the future. (Quinn Aff. ¶ 58.) Quinn envisioned himself as the CEO of this new entity and engaged in negotiations with Scopia on that basis. (Ex. 13 Decl. Barry Pollack, ECF No. 119.1.) During these negotiations, Quinn e-mailed the Plan to David Wittels ("Wittels"), (Ex. D Aff. David Wittels [hereinafter "Ex. D Wittels Aff."], ECF No. 119.2), a partner of Scopia at the time, (Aff. David Wittels ¶ 1 [hereinafter "Wittels Aff."], ECF No. 119.2). However, after Quinn perceived that Scopia would not make him CEO, he stepped away from further negotiations in August 2015. (Ex. 13 Decl. Barry Pollack.) It is undisputed that Scopia and CBC never implemented a roll up and vertical integration strategy in the North Carolina IDD market. (Wittels Aff. ¶ 7; Suppl. Aff. David Wittels ¶¶ 4–5 [hereinafter "Suppl. Wittels Aff."], ECF No. 161.1 ("To this day, while CBC has become a multi-state venture, billing software remains a function of an outside vendor.").)

15.    Rodgers became an independent contractor of CBC in September 2015 and an employee in 2016. (Rodgers Aff. ¶ 19.)

II.

PROCEDURAL BACKGROUND

16.    Plaintiff filed this action on December 5, 2016 against Rodgers, Scopia, Scopia HCM, and CBC, asserting claims against Rodgers for breach of contract and against all Defendants for misappropriation of trade secrets, conversion, unfair or

deceptive trade practices under N.C.G.S. § 75-1.1, and tortious interference with prospective economic advantage. (*See generally* Compl., ECF No. 1.)

17. This case was designated as a mandatory complex business case on January 17, 2017, (Designation Order, ECF No. 3), and assigned to the undersigned on January 25, 2017, (Assignment Order, ECF No. 6).

18. On February 20, 2017, Scopia and Scopia HCM moved to dismiss Aym's Complaint for lack of personal jurisdiction under Rule 12(b)(2) of the North Carolina Rules of Civil Procedure ("Rule(s)") and for inadequate service of process under Rule 12(b)(5). (Defs. Scopia Capital Mgmt. LP & Scopia HCM Partners, LLC's Mot. Dismiss Based Lack Pers. Jurisdiction & Inadequate Serv. Process, ECF No. 10.) That same day, Scopia, Scopia HCM, and CBC moved to dismiss Aym's Complaint for failure to state a claim under Rule 12(b)(6). (Defs. Scopia Capital Mgmt. LP, Scopia HCM Partners, LLC, & Cmty. Based Care, LLC's Mot. Dismiss Pursuant Rule 12(b)(6), ECF No. 11.) The following month, on March 31, 2017, Rodgers answered the Complaint, (Def. Gene Rodgers's Answer Compl., ECF No. 21), and moved to dismiss the claims asserted against him under Rule 12(b)(6), (Def. Gene Rodgers's Mot. Dismiss, ECF No. 22).

19. The Court issued an Order and Opinion on February 9, 2018 granting in part and denying in part Defendants' motions to dismiss. *Aym Techs., LLC*, 2018 NCBC LEXIS 14, at *53–55. The claims the Court permitted to survive Rules 12(b)(2), 12(b)(5), and 12(b)(6) dismissal and proceed to discovery were (i) Aym's trade secret misappropriation claim against Rodgers, Scopia, and CBC, (ii) Aym's section

75-1.1 claim against Scopia and CBC, and (iii) Aym's breach of contract claim against Rodgers. *Id.*

20. On February 27, 2019, Rodgers moved for summary judgment on Plaintiff's remaining claims against him for misappropriation of trade secrets and breach of contract. (Def. Gene Rodgers's Mot. Summ. J., ECF No. 97.) On that same day, Scopia and CBC also moved for summary judgment on Plaintiff's remaining claims against them for misappropriation of trade secrets and unfair and deceptive trade practices. (Mot. Defs. Scopia Capital Mgmt. LP & Cmty. Based Care, LLC Summ. J., ECF No. 119.)

21. On May 3, 2019, after the motions had been fully briefed, Plaintiff filed the Motion to Supplement the Record. (Pl.'s Mot. Leave Ct. Suppl. Summ. J. R. [hereinafter "Mot. Suppl. R."], ECF No. 167.)

22. After full briefing, the Court held a hearing on the Motions on May 29, 2019 (the "May 29 Hearing"), at which all parties were represented by counsel. The Motions are now ripe for resolution.

III.

LEGAL STANDARD

23. Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Morrel v. Hardin Creek, Inc.*, 371 N.C. 672, 680, 821 S.E.2d 360, 366 (2018) (quoting N.C. R. Civ. P. 56(c)). "Summary judgment is

improper if any material fact is subject to dispute." *Culler v. Hamlett*, 148 N.C. App. 389, 391, 559 S.E.2d 192, 194 (2002). "[A]n issue is genuine if it is supported by substantial evidence, which is that amount of relevant evidence necessary to persuade a reasonable mind to accept a conclusion." *Fox v. Green*, 161 N.C. App. 460, 464, 588 S.E.2d 899, 903 (2003) (quoting *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002)).

24. The movant bears the burden of proving the lack of a triable issue. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). "The movant may meet this burden by proving an essential element of the opposing party's claim is nonexistent, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim or cannot surmount an affirmative defense which would bar the claim." *Goodman v. Wenco Foods, Inc.*, 333 N.C. 1, 21 (1992) (quoting *Collingwood v. G.E. Real Estate Equities*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989)). The Court must view all the presented evidence in the light most favorable to the nonmoving party. *Dalton*, 353 N.C. at 651, 548 S.E.2d at 707.

25. Once the moving party demonstrates there is no genuine issue as to any material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Bank of Am. v. McFarland*, 823 S.E.2d 143, 146 (N.C. Ct. App. 2018) (quoting N.C. R. Civ. P. 56(e)). "Merely reciting the allegations set forth in the pleadings or making conclusory statements will not suffice to defeat a motion for summary judgment." *Loftin v. QA Invs., LLC*, 2018 NCBC LEXIS 11, at *20 (N.C. Super. Ct. Feb. 1, 2018) (citing *S.C. Telecoms. Grp.*

*Holdings v. Miller Pipeline LLC*, 248 N.C. App. 243, 245–46, 788 S.E.2d 634, 636–37 (2016)).

26.     Thus, a "motion for summary judgment allows one party to force his opponent to produce a forecast of evidence which he has available for presentation at trial to support his claim or defense." *Dixie Chem. Corp. v. Edwards*, 68 N.C. App. 714, 717, 315 S.E.2d 747, 750 (1984).

IV.

LEGAL ANALYSIS

A.      Plaintiff's Motion to Supplement the Record

27.     Before considering Defendants' motions for summary judgment, the Court first considers Plaintiff's Motion to Supplement the Record. Aym states that it brought this motion to add to the summary judgment record the documents identified in Plaintiff's filings located at ECF Nos. 151, 153, and 153.1, contending that the exhibits filed with the parties' summary judgment briefs leave gaps in the relevant factual record that Aym argues these newly tendered exhibits will fill. (*See* Mot. Suppl. R. 2–3 (expressing motivation to, e.g., complete e-mail threads that were previously filed for context).) Scopia and CBC oppose Aym's motion, arguing that Aym improperly supplemented the record without leave of Court and only after obtaining access to the arguments contained in Scopia and CBC's summary judgment reply brief. (Opp'n Defs. Scopia Capital Mgmt. LP & Cmty. Based Care, LLC Mot. by Pl. Leave Ct. Suppl. Summ. J. R. 5, ECF No. 171.)

28. Although the Court finds the Scopia and CBC arguments persuasive, Aym contends, and Defendants do not dispute, that Plaintiff did not rely upon the supplemental material in its summary judgment briefing or at the May 29 Hearing. As a result, the Court has elected not to consider this material in connection with the Motions. Consequently, it appears to the Court that granting Plaintiff's Motion to Supplement the Record in these specific circumstances will not prejudice Defendants. Accordingly, the Court concludes, in the exercise of its discretion, that Plaintiff's' Motion to Supplement the Record should be granted.

B.    Defendants' Motions for Summary Judgment

(1)    Misappropriation of Trade Secrets (v. Rodgers, Scopia, and CBC)

29. Plaintiff contends that Defendants misappropriated Plaintiff's trade secrets in violation of the North Carolina Trade Secret Protection Act (the "NCTSPA"), N.C.G.S. § 66-152, *et seq.*, when Rodgers disclosed Aym's Plan to Scopia so that Scopia could use the Plan to acquire certain North Carolina IDD companies, including HCM, Hughes, and Lindley. (Br. Opp'n Scopia/CBC Summ. J. Mot. 19); *see* N.C.G.S. § 66-153 ("The owner of a trade secret shall have remedy by civil action for misappropriation of his trade secret."). Defendants argue that the Court should enter judgment dismissing Aym's trade secret misappropriation claim because Aym has failed to present evidence from which a jury could find that Aym has identified a protectable trade secret under Chapter 66 and, even if it has, because Aym has not presented evidence of Defendants' misappropriation. (Mem. Supp. Mot. Defs. Scopia

Capital Mgmt. LP & Cmty. Based Care, LLC Summ. J. 2–3, ECF No. 120.) The Court agrees with Defendants on both points.

30. To prevail under the NCTSPA, "a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec v. Manly*, 370 N.C. 602, 609, 811 S.E.2d 542, 547–48 (2018) (quoting *Washburn v. Yakin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 326, 660 S.E.2d 577, 585 (2008)). A plaintiff may not simply make "general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated[.]" *Washburn*, 190 N.C. App. at 327, 660 S.E.2d at 585.

31. The NCTSPA defines a trade secret as:

business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

a. derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3). In determining whether information constitutes a trade secret, courts consider:

(1) The extent to which [the] information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of [the] information to [the] business and its

competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997).

### a. The Plan

32. Aym alleged several trade secrets in its Complaint, including the Plan. Aym did not attach the Plan to the Complaint but alleged that the Plan included "a list of Aym's proposed acquisition targets[,]" (Compl. ¶ 13), and discussed Aym's confidential acquisition strategy, including that "the first acquisition should be a 'platform' or foundational provider which had a relatively large market, had licenses to cover every payor in North Carolina, was financially stable with a good management team, and was an existing customer of Aym[,]" (Compl. ¶ 14). Based on the allegations concerning the Plan in Aym's Complaint—including that the Plan contained a specific list of confidential acquisition targets—the Court permitted Aym's misappropriation claim to survive Rule 12(b)(6) dismissal, but only to the extent the claim was based on the Plan. *See Aym Techs., LLC*, 2018 NCBC LEXIS 14, at *38 ("Plaintiff's allegations reference a specific confidential document, specifically describe its contents, and identify with particularity the misappropriated information that Plaintiff contends is proprietary and confidential."). The Court otherwise dismissed Aym's trade secret claim. *Id.* at *39–40.

33. The written Plan has now been made part of the record at summary judgment, and it cannot be disputed that the Plan does not comport with Aym's

characterization of that document in its Complaint. Significantly, and contrary to Aym's specific allegations, the Plan does not identify HCM, Hughes, or Lindley and does not otherwise contain a list of proposed acquisition targets, or a formula for identifying them. (*Compare* Compl. ¶ 14, *with* Plan 2 (vaguely describing roll up as one "under the foundation of an existing, large and successful provider" and the strategy as creating "a partnership . . . between a targeted strong [I]DD provider and Aym" without identifying any targets).) Moreover, rather than describe the Plan as an actionable strategy, when Quinn e-mailed the Plan to Wittels in 2015, he described the Plan as "rough" and as a "white paper[,]" (Ex. D Wittels Aff.), and later described it as "high level rough" at his deposition, (Ex. 18 Decl. Barry Pollack 67:12–13 [hereinafter "1/28/19 Quinn Dep."], ECF No. 119.1).

34. A review of the Plan document shows that, at most, the Plan simply lists difficulties that all North Carolina IDD providers face in the marketplace and bullet-points the goals Aym hoped to achieve through a roll up and vertical integration, including creating synergies through consolidation of providers, uniform implementation of Aym's OnTarget software, and economies of scale. (*See* Plan 2–3.) The evidence is undisputed, however, that Aym was not unique in recognizing an opportunity to roll up IDD providers in North Carolina. Indeed, Aym's CEO testified that there was general interest in consolidation among participants in the North Carolina IDD industry during this time and that the benefits that an acquirer could obtain by rolling up providers were well known in the industry. (*See* Quinn Dep. Vol. I 47:23–25 ("The fact that the MCOs wanted providers to consolidate . . . was not an

unknown thing."), 48:24–49:3 ("Q. And the fact that the system was publicly discussed as a closed network system that would create benefits to those who consolidated, that was not a trade secret of Aym's, correct? A. In and of itself, that's correct.").)

35. It is true, as Aym argues in opposition, that a trade secret may be built upon publicly available information "if the information or process has particular value as a compilation or manipulation of information," depending on certain factors. *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at *31–32 (N.C. Super. Ct. Feb. 18, 2016) (citing *Byrd's Lawn & Landscaping, Inc.*, 142 N.C. App. 371, 376, 542 S.E.2d 689, 692 (2001)); *see, e.g.*, *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *26 (N.C. Super. Ct. Apr. 23, 2015) (recognizing that a compilation of publicly available information may receive trade secret protection "where the claimant encountered some difficulty in assembling each of the public components").

36. The undisputed evidence, however, refutes Aym's contention that the idea to apply a standard merger practice—a roll up—to a particular market and reap the attendant benefits has "particular value" and thus constitutes a trade secret. To the contrary, Aym admits that a strategy of rolling up IDD companies—the core concept of Aym's Plan—is well known and not a trade secret. (*See* Quinn Aff. ¶ 19 ("[T]he concept of a roll up was known by many in the world of finance."); Finley Dep. 165:1–3 ("Q. Is a rollup of companies by itself a confidential concept? A. No."); *see also* Aff. Michael McGregor ¶ 4 [hereinafter "McGregor Aff."], ECF No. 119.4 ("Rolling-up like

this is how 'the game is played' in human services and other fragmented industry in the US today. This sort of roll-up strategy is not unique[.]").)

37. Thus, based on the foregoing, and, in particular, Aym's failure to offer evidence showing that the Plan contains confidential or proprietary information, the Court concludes that Aym has failed to offer evidence from which a jury could reasonably conclude that the Plan has "actual or potential commercial value [due to] not being generally known or readily ascertainable through independent development or reverse engineering." N.C.G.S. § 66-152(3)(a); (*see* Quinn Dep. Vol. I 47:23–25, 48:24–49:3; Quinn Aff. ¶ 19; Finley Dep. 165:1–3; McGregor Aff. ¶ 4.)

38. As a result, and as demonstrated above, the Plan does not constitute a trade secret under Chapter 66 as a matter of law, and judgment should be entered dismissing Aym's trade secret misappropriation claim. *See, e.g.*, *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 469–70, 579 S.E.2d 449, 454 (2003) (declining to extend trade secret protection to "chips" or their production processes because they were "generally known in the industry, are process dependent so as to preclude misappropriation, or are readily ascertainable by reverse engineering"); *Combs & Assocs., Inc. v. Kennedy*, 147 N.C. App. 362, 370–71, 555 S.E.2d 634, 640 (2001) (holding that customer database was not a trade secret because the defendants could have compiled same information from "public listings such as trade show and seminar attendance lists"); *see also Novacare Orthotics & Prosthetics E., Inc. v. Speelman*, 137 N.C. App. 471, 478, 528 S.E.2d 918, 922 (2000) (denying trade secret status to customer lists that could have been compiled through a local phonebook);

*DSM Dyneema, LLC v. Thagard*, 2019 NCBC LEXIS 44, at \*40–43 (N.C. Super. Ct. June 19, 2019) (holding that the defendant did not have a plasma and scouring treatment trade secret because "the general use of plasma and scouring treatment on fibers of anti-ballistic materials is generally known in the industry").

### b. Aym's Alleged "Plan Plus" Trade Secret

39. Aym seeks to salvage its trade secret claim by expanding its alleged trade secret beyond the Plan document itself, ignoring the limits set forth in the Court's February 2018 ruling on Defendants' motions to dismiss, to suggest that the Plan document is merely a "summary" of Aym's acquisition strategy and not a detailed description of Aym's purported trade secret. (Quinn Aff. ¶ 25.) Quinn described this new and expanded trade secret at his deposition as:

> the ability to step back and see the things that were going on; not just at that level, but the other – but a lower level within the industry. And so you start to add all these things up and pile them up, then they become an indicator that something special is going on that you – isn't obvious to everyone. So it's not just each individual thing that one person may know or another person knows, it's the aggregation of those and the conclusion that you draw on those; and the things that . . . means along with other things that made that part of the plan that I'm calling confidential.

(Quinn Dep. Vol. I 47:25–48:13.)

40. Aym sought to provide coherence to this description in its brief in opposition to Scopia and CBC's motion for summary judgment:

> Due to Aym's unique position as a software provider and consultant to North Carolina IDD providers, Aym gained insight into this industry and the challenges faced by IDD providers. In addition, Aym gained an understanding of how these businesses were operated, which allowed Aym to discover inefficiencies in their operations. Through Aym's development of OnTarget and Aym's consulting work, Aym developed strategies to eliminate these inefficiencies and turn struggling

businesses into a profit-making venture. It is the compilation of this information combined with Aym's analysis of that information and development of an integration plan incorporating both the underlying information and the analysis that constitutes a trade secret here.

(Br. Opp'n Scopia/CBC Summ. J. Mot. 13.)

41. Based on Quinn's testimony and its revised trade secret description, Aym argues that the Plan is "much more than just the idea to roll-up IDD providers[,]" contending instead that "[i]t included concepts of integration . . . in a manner which would eliminate inefficiencies and increase the profit[] margins of these companies[,]" as well as "specific criteria of which IDD providers to target and how to identify those target providers." (Br. Opp'n Scopia/CBC Summ. J. Mot. 14.)

42. Even as reinvented, however, Aym's claim must still be dismissed because Aym has failed to describe this newly conceived trade secret with the specificity our Supreme Court requires. In particular, both Quinn's description of Aym's revised trade secret and Aym's description in its brief in opposition to the Motions lack detail, are broadly stated and confusing, are unsupported by any record evidence other than Quinn's conclusory assertions, and fail to put Defendants on notice of what they are alleged to have misappropriated. *See, e.g.*, *Krawiec*, 370 N.C. at 611, 811 S.E.2d at 549 ("[P]laintiffs' failure to describe a specific idea, concept, strategy, or tactic with respect to their marketing plan or to provide any detail about [the alleged trade secrets] renders their claim too general for this Court to determine[.]"); *see also Comput. Design & Integration, LLC v. Brown*, 2018 NCBC LEXIS 216, at *35–36 (N.C. Super. Ct. Dec. 10, 2018) (holding that information described as "proprietary and unique solutions" was "broad, vague, and [not] identified with sufficient

particularity, or supported with record evidence, to constitute a trade secret under North Carolina law").

43.    Furthermore, neither the Plan nor Quinn's or Aym's revised description of Aym's alleged trade secret includes a list of acquisition targets, specifies a formula for identifying acquisition targets, identifies Aym's interest in acquiring any specific companies, or references HCM, Hughes, or Lindley in any respect.    Without identifying specific acquisition targets or a distinct method for determining them in this context, Aym's revised trade secret descriptions essentially identify and explain the concept of roll up and vertical integration, the latter another widely known corporate strategy, and nothing more.  *See Vertical Integration*, Merriam-Webster Dictionary (2019) (defining vertical integration as "the combining of manufacturing operations with source of materials and/or channels of distribution under a single ownership or management especially to maximize profits").

44.    In addition, that Aym may have contemplated applying a roll up and vertical integration strategy to the North Carolina IDD industry because of identified industry fragmentation and regulatory changes, as Aym suggests, (Quinn Aff. ¶¶ 10–18), does not elevate Aym's broad description into a protectable trade secret.  Indeed, the evidence is undisputed that it was well known both that the North Carolina IDD industry was highly fragmented, (*see* Aff. Laurie McDaniel ¶ 9, ECF No. 119.3 ("It was well known for years that the IDD industry in North Carolina was highly fragmented, with a closed network so that entry had to be by acquisition.")), and that IDD providers were subject to regulatory pressures, (*see* McGregor Aff. ¶ 4 ("By 2014,

the North Carolina Innovations Waiver, the closed networks of Managed Care Organizations ("MCOs"), and the regulatory pressures on small IDD providers . . . were known inside and outside of North Carolina.")). Aym has offered no evidence that the application of a roll up and vertical integration strategy to respond to these widely known market dynamics was original to Aym or proprietary in any way. (*See* Quinn Dep. Vol. I 47:23–25, 48:24–49:3.)

45. As such, the undisputed evidence shows, at most, that Aym's newly revised trade secret consists of no more than broad, vague statements of generally known business concepts and a generally known or readily ascertainable strategy to apply those concepts to the IDD market in North Carolina. Such is not enough. *See, e.g., RLM Commc'ns., Inc. v. Tuschen*, 66 F. Supp. 3d 681, 700 (E.D.N.C. 2014) (finding, under North Carolina law, a "business development opportunity" readily ascertainable because the evidence described "a nebulous, potential, business opportunity, not yet realized"); *Thee Dollhouse Prods. N.C., Inc. v. Fairchild*, No. 5:08-CV-282-FL, 2009 U.S. Dist. LEXIS 132727, at *33 (E.D.N.C. Mar. 30, 2009) (finding, under North Carolina law, contents of "manuals and lectures on hospitality . . . readily ascertainable by someone experienced in the field").

46. For each of these reasons, therefore, even if the Court were to consider Aym's restated and revised trade secret as something beyond the Plan document itself, Aym's misappropriation claim necessarily fails.

c. Reasonable Efforts to Maintain Secrecy

47. Even if Aym had identified a protectable trade secret in the Plan on which

to base its misappropriation claim, Aym's trade secret claim must nevertheless be dismissed under Rule 56 because the undisputed evidence of record shows that the Plan was not "the subject of efforts that [we]re reasonable under the circumstances to maintain its secrecy." N.C.G.S. § 66-152(3)(b). In particular, it is undisputed that Quinn and Aym's investment banker shared the Plan or its contents with multiple third-parties without marking the Plan confidential, without obtaining nondisclosure agreements prior to disclosure, or otherwise taking measures to assure the continued confidentiality of the Plan.

48.     In particular, it is undisputed that, in September 2014, Quinn disclosed the Plan to David Swintosky ("Swintosky"), an investment banker engaged to assist Aym with its acquisitions, without a nondisclosure agreement or instructions that the Plan should not be shared with third-parties absent confidentiality protections. (Swintosky Dep. Vol. I 76:18–77:13; Ex. 6 Decl. Barry Pollack, ECF No. 119.1; Ex. 20 Decl. Barry Pollack 76:12–77:20, ECF No. 119.1; Ex. 27 Decl. Barry Pollack, ECF No. 119.1.) Swintosky then disclosed the Plan to Whittington in late 2014 without a confidentiality agreement or instructions to keep the Plan confidential in furtherance of Aym's potential acquisition of HCM, (1/28/19 Quinn Dep. 27:1–29:23), and discussed Aym's strategy with Neil Lindley, again without a confidentiality agreement or similar instructions, in furtherance of Aym's potential acquisition of Lindley, (Swintosky Dep. Vol. I 135:17–136:14).

49.     Similarly, Quinn attached the Plan to an e-mail he sent to Wittels at Scopia on July 28, 2015, again without a confidentiality agreement or any assurance from

Scopia that the Plan would be kept confidential. (Ex. D Wittels Aff.) In referencing the Plan in this e-mail, Quinn stated that he didn't "think there [was] anything of a proprietary nature that isn't already common knowledge." (MSJ-8 Dep. Ex. 66, ECF No. 106.) Wittels testimony is consistent:

Q. Do you recall [Quinn] sent you what he called a white paper?
A. Yes.
Q. It's got a title; it said something about Aym vertical acquisition strategy. Right?
A. Correct.
Q. Did you ask him to send that?
A. No.
Q. Did he ask you to keep it confidential?
A. No.
Q. Did he make any efforts in his interaction with you to try to protect it as something that was like a secret sauce or trade secret of Aym?
A. No.

(Wittels Dep. 104:24–105:15.)[3]

50. Based on the above, the Court concludes that Aym's claim must be dismissed for the separate and independent reason that Aym has failed to produce evidence that it engaged in reasonable efforts to maintain the Plan's secrecy sufficient to survive scrutiny under Rule 56. *See Stephenson v. Langdon*, No. COA09-1494, 2010 N.C. App. LEXIS 1682, at *16 (N.C. Ct. App. Sept. 7, 2010) (affirming dismissal of trade

---

[3] Aym argues that at the time that Quinn sent Scopia the Plan, he believed that Rodgers had already disclosed the Plan to Scopia, (Quinn Aff. ¶ 59), and that Quinn had signed and returned a confidentiality agreement with Scopia that incorporated an agreement between Scopia and HCM with a mutual confidentiality clause, (Br. Opp'n Scopia/CBC Summ. J. Mot. 15). As discussed elsewhere in this Opinion, there is no evidence that Rodgers disclosed the Plan to Scopia, and the unambiguous language of the Quinn/Scopia and Scopia/HCM agreements makes plain that Quinn's agreement with Scopia created a unilateral obligation from Quinn to Scopia, and Scopia's agreement with HCM created an obligation to and from Quinn and HCM. Neither agreement imposed a confidentiality obligation on Scopia regarding information it received from Quinn, including the Plan.

secret claim under Rule 56 for plaintiff's failure to demonstrate reasonable efforts to maintain secrecy).

### d. Misappropriation

51.    Finally, separate and apart from the foregoing, Aym's claim also fails because Aym has failed to present substantial evidence of misappropriation of the Plan, Quinn's revised formulation of Aym's alleged trade secret, or Aym's description of its trade secret in opposition to these Motions. *See Fox,* 161 N.C. App. at 464, 588 S.E.2d at 903 ("[A]n issue is genuine if it is supported by substantial evidence, which is that amount of relevant evidence necessary to persuade a reasonable mind to accept a conclusion.").

52.    To establish a prima facie case of trade secret misappropriation, a plaintiff must introduce substantial evidence that the defendant "(1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C.G.S. § 66-155. The NCTSPA defines "[m]isappropriation" as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." *Id.* § 66-152(1).

53.    Aym has failed to come forward with evidence tending to show that Rodgers disclosed the Plan, that Scopia and CBC acquired the Plan from Rodgers, or that Rodgers disclosed either Aym's interest in purchasing HCM, Hughes, or Lindley or

any confidential roll up and vertical integration strategy Aym intended to use in acquiring providers in the North Carolina IDD market. Aym admits that there is no direct evidence—neither documents nor testimony—showing that Rodgers delivered Aym's Plan or restated trade secret to Scopia. Aym's former chief operating officer, Douglas Finley ("Finley"), admitted as much at his deposition:

> Q. You're not aware of any confidential information that CBC had or used to acquire Lindley when it did, right?
> A. I'm aware that Gene Rodgers was introduced to Neil Lindley by Lewis Quinn and myself. He had – he did not know them prior to that time.
> Q. Again, my question is –
> A. Confidential information, no.
> …
> Q. Okay. So Mr. – as you just said, you cannot identify any confidential information that Mr. Rodgers or CBC or Scopia had when Lindley was acquired, right, that helped it, correct?
> A. I cannot identify.
> Q. Okay. And the same goes for Hughes and HomeCare Management, right?
> A. I cannot identify.

(Finley Dep. 149:20–150:11.)

54. Indeed, Finley acknowledged that Rodgers informed Aym that HCM, Hughes, and Lindley were prepared to sell—not, as Aym attempts to now claim, that Aym conveyed this "confidential" information to Rodgers so that he could set up introductions:

> Q. And so the identity of Rankin Whittington and HomeCare Management as a potential buyer did not originate as confidential information of Aym. That was something that Mr. Rodgers developed and provided to you, right?
> A. Mr. Rodgers provided the information that Rankin was interested in selling his business, yes.
> …
> Q. So the timing and the identity of HomeCare Management and Hughes Behavioral did not start off as Aym's confidential information. It was information that Gene Rodgers actually brought to Aym, right?
> A. I agree with that.

...
Q. So as you sit here today, you can't state under oath I have personal knowledge that Mr. Rodgers used some kind of timing or identity of confidential information belonging to Aym when conversations came up in 2016 between Lindley and CBC where Mr. Rodgers was working, correct?
A. Correct. I can't state that.

(Finley Dep. 165:14–21, 166:12–17, 167:2–8.)

55. Without direct evidence, and acknowledging that it does not "contend that the simple fact that an IDD provider was interested in selling was not generally known[,]" (Br. Opp'n Scopia/CBC Summ. J. Mot. 4), Aym seeks to sustain its claim through what it contends is compelling circumstantial evidence showing that Rodgers passed the Plan or its contents to Scopia or CBC, (*see* Br. Opp'n Scopia/CBC Summ. J. Mot. 17–19). Aym relies primarily on e-mail communications between Rodgers and Scopia to support its contention. (*See, e.g.*, Ex. 31, 35 Wilder Aff., ECF No. 147; *see also* Ex. 29 Wilder Aff. 67:14–68.1, 80:7–21, ECF No. 153.1.) In particular, Aym argues that because Scopia—which Aym asserts had no prior knowledge or experience in the North Carolina IDD industry and relied heavily on Rodgers to develop its acquisition strategy—targeted HCM, Hughes, and Lindley, a jury could reasonably infer that Rodgers must have shared with Scopia the identity of these entities as potential targets Aym intended to roll up and vertically integrate. (Br. Opp'n Scopia/CBC Summ. J. Mot. 17–18.)

56. To support this inference, Aym relies heavily on a statement in an investment deck Scopia prepared stating that the opportunity to purchase HCM "was introduced to Scopia through a proprietary relationship with an industry veteran (Gene Rodgers) with over 20 years of experience in the North Carolina IDD market."

(*See* Br. Opp'n Scopia/CBC Summ. J. Mot. 18 (quoting Ex. F Wittels Aff., ECF No. 118); Wittels Dep. 7:25–9:12.) But the investment deck says nothing about Aym's interest in acquiring HCM, Hughes, Lindley, or any other provider, and only explores HCM's and Hughes's positions in the North Carolina IDD market and identifies them as potential acquisition targets for Scopia. As such, the investment deck's reference to Rodgers and his contact with Scopia provides no proof for Aym's contention that Rodgers disclosed the Plan or Aym's confidential information to Scopia. At root, Aym asks the Court to indulge an inferential leap to find misappropriation, one that not only ignores the undisputed evidence that Rodgers learned of these entities' interest in selling wholly apart from Aym and the Plan, (Rodgers Aff. ¶¶ 7, 12; Quinn Dep. Vol. II 121:19–22), but also the unrefuted testimony that Rodgers did not disclose Aym's acquisition interests to Scopia or CBC, (Finley Dep. 149:20–150:11, 165:14–21, 166:12–17, 167:2–8; Rodgers Aff. ¶ 21).

57. Distilled, Aym's theory is essentially one of inevitable disclosure, a concept that North Carolina courts have been reluctant to embrace under Chapter 66 and that requires the factfinder here to engage in impermissible speculation and conjecture to indulge the inferences Aym's theory necessitates. *See, e.g.*, *InVue Sec. Prods., Inc. v. Stein*, 2017 NCBC LEXIS 115, at *28 (N.C. Super. Ct. Dec. 18, 2017) (declining to " 'infer' that [defendant's] discussions with [co-defendant] involved [plaintiff's] confidential information" and holding that, "[i]n the absence of evidence that [defendant] actually disclosed confidential information to [co-defendant], [plaintiff's] speculation that he may have done so is insufficient to carry its burden");

*Amerigas Propane, LP v. Coffey*, 2015 NCBC LEXIS 98, at \*29–30, 35–36 (N.C. Super. Ct. Oct. 15, 2015) (declining to assume misappropriation from evidence of a missing customer list and a rapid transition of customers following the departed employee). For this additional reason, therefore, summary judgment should be entered dismissing Aym's misappropriation claim. *See Henson v. Green Tree Servicing LLC*, 197 N.C. App. 185, 189, 676 S.E.2d 615, 618 (2009) ("The plaintiff must 'offer evidence, beyond mere speculation or conjecture, sufficient for a jury to find every essential element of [its] claim.' " (quoting *Abell v. Nash Cty. Bd. of Educ.*, 89 N.C. App. 262, 264–65, 365 S.E.2d 706, 707 (1988)).

58.     In addition, the undisputed evidence also forecloses Aym's contention that Defendants used the Plan or Aym's revised trade secret. *See* N.C.G.S. § 66-152(1) (defining "[m]isappropriation" as the "acquisition, disclosure, *or use* of a trade secret" (emphasis added)). The undisputed evidence shows that neither Scopia nor CBC ever employed a roll up and vertical integration strategy with Aym or any other software provider after acquiring HCM, Hughes, and Lindley. (Wittels Aff. ¶ 7; Suppl. Wittels Aff. ¶¶ 4–5 ("To this day, while CBC has become a multi-state venture, billing software remains a function of an outside vendor.").)

59.     For each of these reasons, therefore, the Court concludes that Plaintiff's trade secret misappropriation claim must be dismissed under Rule 56.[4]

---

[4] In light of the Court's dismissal of this claim, the Court need not address Defendants' additional arguments that (i) even if the Plan was a trade secret under Chapter 66, Quinn waived trade secret protection by sharing it with Scopia without first securing a non-disclosure agreement and (ii) Aym was not the proper party to assert the misappropriation claim because Quinn generated and executed the Plan for his own benefit, not as Aym's agent. Further, because the Court elects not to address Defendants' proper party and agency

(2)     Unfair and Deceptive Trade Practices (v. Scopia and CBC)

60.     Scopia and CBC contend that summary judgment should be entered dismissing Aym's claim under North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C.G.S. § 75-1.1, *et seq.*, because the claim is based entirely on the same conduct that supports Aym's now-dismissed trade secret claim. Although Aym argues that its claim is supported by additional evidence that Defendants "actively and deceptively withheld information from Aym and directly lied to Aym to hide Rodgers' involvement in the HCM transaction[,]" (Br. Opp'n Scopia/CBC Summ. J. Mot. 24), the Court previously determined in its February 2018 Opinion that Aym's UDTPA claim could only advance to the extent the claim was based on the allegations supporting its trade secret misappropriation claim, *see Aym Techs., LLC*, 2018 NCBC LEXIS 14, at *50. Since the misappropriation and UDTPA claims are based entirely on the same conduct, the Court's conclusion that Aym has failed to offer evidence of misappropriation under Chapter 66 compels the same conclusion concerning the sufficiency of Aym's proof under section 75-1.1. *See, e.g.*, *Area Landscaping, LLC v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 526, 586 S.E.2d 507, 512 (2003) (affirming dismissal of UDTPA claim based solely on defendants' alleged misappropriation of trade secrets where evidence was insufficient to sustain misappropriation claim). Aym's UDTPA claim should therefore be dismissed.

(3)     Breach of Contract (v. Rodgers)

61.     Aym also asserts a breach of contract claim against Rodgers, alleging that

---

arguments, the Court likewise need not address Aym's contention that Scopia was liable for Rodgers's conduct under agency principles.

Rodgers breached the confidentiality provision of the ICA by disclosing to Scopia confidential information (including the Plan), Aym's interest in purchasing HCM, and the details of the timing, price, and structure of Aym's offer to HCM. (Pl.'s Br. Opp'n Def. Gene Rodgers's Mot. Summ. J. 7–8 [hereinafter "Br. Opp'n Rodgers's Mot. Summ J."], ECF No. 155.) Rodgers argues that he is entitled to summary judgment on Aym's claim because the ICA was not supported by consideration, and even if it were, there is no evidence that Rodgers disclosed confidential information contrary to its terms. (*See* Def. Gene Rodgers's Mem. L. Supp. Mot. Summ J. 1–2 [hereinafter "Rodgers's Br. Supp."], ECF No. 116.) The Court agrees with Rodgers.

62. In North Carolina, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). For a contract to be enforceable, it must be supported by consideration, *Inv. Props. of Asheville, Inc. v. Norburn*, 281 N.C. 191, 195, 188 S.E.2d 342, 345 (1972), and consideration has been defined as "any benefit, right, or interest bestowed upon the promisor, or any forbearance, detriment, or loss undertaken by the promisee," *Elliott v. Enka-Candler Fire & Rescue Dep't, Inc.*, 213 N.C. App. 160, 163, 713 S.E.2d 132, 135 (2011) (quoting *Lee v. Paragon Grp. Contractors, Inc.*, 78 N.C. Ap. 334, 337–38, 337 S.E.2d 132, 134 (1985)).

a.  Consideration

63. Although the parties agree that in or about April 2009 Aym began compensating Rodgers as an independent contractor for continuing to make software referrals that he had previously been making of his own accord, (Rodgers Aff. ¶ 9;

Quinn Aff. ¶ 33), they dispute when the ICA was entered and whether it was supported by adequate consideration.

64. In the analogous situation of an employer/employee relationship, our courts "have noted [that] an employer and employee may agree to terms at the outset of an employment relationship and later reduce those terms to writing. In that circumstance, the employment relationship may serve as consideration for the agreement despite the absence of a contemporaneous signed writing." *Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 51, at *9 (N.C. Super. Ct. June 9, 2017) (citing *Young v. Mastrom, Inc.*, 99 N.C. App. 120, 123, 392 S.E.2d 446, 448 (1990)); *see also Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 NCBC LEXIS 33, at *15 (N.C. Super. Ct. Oct. 19, 2007) ("It is immaterial that the written covenant is executed after the employee starts to work, so long as the terms incorporated therein were agreed upon at the time of employment."). New consideration is required, however, to support modification of an existing agreement. *Clifford v. River Bend Plantation, Inc.,* 312 N.C. 460, 466, 323 S.E.2d 23, 27 (1984) ("[A]n agreement to modify the terms of a contract must be based on new consideration or on 'evidence that one party intentionally induced the other party's detrimental reliance[.]' " (quoting *Wheeler v. Wheeler*, 299 N.C. 633, 636, 263 S.E.2d 763, 765 (1980)).

65. Rodgers argues that although the ICA is dated April 1, 2009, (ICA 1, 4), he is entitled to summary judgment because the undisputed evidence shows that he did not sign the ICA, including its confidentiality provision, until several years into his relationship with Aym, the ICA contained different terms than those agreed to by the

parties in April 2009, and Aym has failed to come forward with any evidence of consideration to render the ICA enforceable. (Rodgers's Br. Supp. 11.)

66. In particular, Rodgers argues that the ICA was signed for the first time in 2012 and backdated to April 1, 2009. For support, he points to Quinn's representation in 2012 that he needed an independent contractor agreement with Rodgers for an audit, (Rodgers Aff. ¶ 11), and to an e-mail exchange between Quinn and Rodgers on March 31, 2009 in which, after both parties confirmed their understanding of the agreement, Quinn stated: "I would prefer, at this stage not to have a written agreement, unless you require it[,]" to which Rodgers replied, "I don't need a written agreement either[,]" (Ex. B Rodgers Aff., ECF No. 111). The undisputed record further shows that the ICA contained terms, including noncompetition and nondisclosure provisions, that were not contemplated when the parties began their relationship in April 2009, (*compare* Ex. B Rodgers Aff. (summarizing agreement in March 2009 with, e.g., no mention of confidentiality agreement), *with* ICA Art. II–III (including non-disclosure and non-competition provisions).

67. The only evidence Aym offers in support of an April 1, 2009 ICA execution date are tentative, speculative, and conclusory statements by Quinn:

> Q. You'd agree that this particular copy [of the ICA] was signed in 2012?
> A. No, I don't know when it was signed. [Rodgers] may have just sent me a copy of the one he had. I don't know.
> Q. Separate from this copy that has a fax tag line of September 27, 2012 on it, do you have any copy of a document that you had in your office before that dating back to April 1, 2009?
> A. That's why I asked him to send it to me because I didn't have one. I'm assuming either, one, he signed previously since he dated it '09, or he took the one that I gave him as an example and signed it and sent it back. I'm not sure which he did.

(Quinn Dep. Vol. II 81:19–82:7.) Aym provides no evidence that Quinn or anyone else saw Rodgers sign the ICA in April 2009 or that Aym received the signed document in April 2009. Quinn's conclusory, speculative assertion therefore stands alone and is insufficient to carry Aym's burden under Rule 56. *See Loftin*, 2018 NCBC LEXIS 11, at *20 ("Merely . . . making conclusory statements will not suffice to defeat a motion for summary judgment." (citing *S.C. Telecoms. Grp. Holdings*, 248 N.C. App. at 245–46, 788 S.E.2d at 636–37)).

68. Aym sought to improve Quinn's testimony with his subsequent affidavit, (*see* Quinn Aff. ¶ 33 ("Rodgers signed the ICA in or around April 2009.")), but our courts have expressly rejected this tactic on summary judgment, *see, e.g.*, *Wachovia Mortg. Co. v. Autry-Barker-Spurrier Real Estates, Inc.*, 39 N.C. App. 1, 9–10, 249 S.E.2d 727, 732 (1978) (finding that a party may not create an issue of fact by contradicting a prior deposition in a subsequently filed affidavit because "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).

69. Even if the Court were to consider Quinn's subsequently-filed affidavit—which contains no explanation or facts supporting or explaining his altered recollection—Quinn again offers nothing more than a conclusory assertion that contradicts the admitted e-mail exchange between Quinn and Rodgers on March 31, 2009. Such evidence does not create an issue of material fact at summary judgment.

*See* N.C. R. Civ. P. 56(e) (requiring that a party adverse to a summary judgment motion "must set forth specific facts showing that there is a genuine issue for trial"); *Loftin*, 2018 NCBC LEXIS 11, at *20 (citing *S.C. Telecoms. Grp. Holdings*, 248 N.C. App. at 245–46, 788 S.E.2d at 636–37)). Thus, the Court concludes that the record evidence compels the conclusion that the ICA was signed after April 1, 2009 as a matter of law.

70. The undisputed evidence also shows that the ICA modified the terms under which the parties began their relationship in April 2009 by adding non-compete and non-disclosure clauses. (*Compare* Ex. B Rodgers Aff. (summarizing agreement as of March 31, 2009), *with* ICA Art. II–III.) Thus, new consideration was necessary to make the ICA enforceable when it was signed long after the parties' working relationship began. *Geiger v. Cent. Carolina Surgical Eye Assocs., P.A.*, No. COA14-169, 2014 N.C. App. LEXIS 1051, at *17 (N.C. Ct. App. Oct. 7, 2014) ("[A] modification must 'contain all the essential elements of a contract.' " (quoting *Yamaha Int'l Corp. v. Parks*, 72 N.C. App. 625, 628, 325 S.E.2d 55, 58 (1985)); *see Altman v. Munns*, 82 N.C. App. 102, 105, 345 S.E.2d 419, 422 (1986) ("The critical elements are mutual assent to the modification, and consideration or a substitute supporting it." (citing *Clifford,* 312 N.C. 460, 323 S.E.2d 23)).

71. Aym offers no evidence of a change in Rodgers's duties, rights, compensation, or benefits at the time of signing—no evidence of anything bestowed upon Rodgers, and no evidence of any forbearance, detriment, or loss undertaken by Aym. (Rodgers Aff. ¶ 11.) Therefore, Aym has failed to present evidence of new

consideration sufficient to support Rodgers's entry into the ICA. *See, e.g.*, *Franco v. Lipoglience, Inc.*, 197 N.C. App. 59, 63, 676 S.E.2d 500, 503 (2009) (holding agreement that "did not increase or diminish [employee's] pay, duties, [or] rights" unenforceable for lack of consideration); *see also Kadis v. Britt*, 224 N.C. 154, 161–63, 29 S.E.2d 543, 547–49 (1944) (finding that continued at-will employment is illusory consideration because "consideration cannot be constituted out of something that is given and taken in the same breath − of an employment which need not last longer than the ink is dry upon the signature of the employee").

72.     As a result, the Court concludes that the ICA is not supported by consideration and is unenforceable as a matter of law. Plaintiff's breach of contract claim against Rodgers must therefore be dismissed. *See, e.g., Haynes v. B&B Realty Grp., LLC*, 179 N.C. App. 104, 110, 633 S.E.2d 691, 695 (2006) (holding that past services of an independent contractor are insufficient consideration for a new agreement); *Comp. Design & Integration, LLC v. Brown*, 2018 NCBC LEXIS 216, at *55 (N.C. Super. Ct. Dec. 10, 2018) (holding confidentiality agreements were not supported by consideration where employees "were not offered any personal gain or benefit"); *Addison Whitney*, 2017 NCBC LEXIS 51, at *7–8 ("[I]f the employer and employee enter into the [confidentiality] agreement after the creation the employment relationship, the promise of continued at-will employment is inadequate consideration.").[5]

---

[5]  In light of the Court's conclusion that the ICA is unenforceable for lack of consideration, the Court need not address Aym's related, but belatedly advanced, contention that the duty of good faith and fair dealing within the ICA required Rodgers to disclose to Aym that he was assisting competitors in acquiring companies Aym had allegedly targeted. *See, e.g., Sterling*

b.    Breach

73.    In addition, even if the ICA were deemed enforceable, Plaintiff's contract claim still must fail because Aym has not offered any evidence that Rodgers breached the agreement.   Aym maintains that Rodgers breached the ICA by disclosing to Scopia the Plan and other confidential information, including "Aym's interest in acquiring HCM, Hughes, [and] Lindley," in violation of the ICA's confidentiality provision.  (Br. Opp'n Rodgers's Mot. Summ J. 7−8.)  The specific provision at issue, ICA Section 1.02, states that:

> [e]xcept as may be required to carry out his or her duties and responsibilities to [Aym], Contractor covenants and agrees not to disclose, directly or indirectly, for any purpose whatsoever any confidential information that Contractor has been [sic] obtained or disclosed to Contractor as a result of association with [Aym].

(ICA § 1.02.)

74.    The ICA defines "[C]onfidential Information" as "any information not generally known to the public about [Aym], and [Aym]'s Customers and Vendors, including, but not limited to : . . . trade secrets, procedures, manuals, . . . contracts, . . . research and development data and information, . . . marketing plans or techniques, organization or operation." (ICA § 1.01.)  As discussed above, Plaintiff has failed to offer evidence of Rodgers's misappropriation of Aym's alleged trade

---

*Title Co. v. Martin*, No. COA18-1189, 2019 N.C. App. LEXIS 678, at \*16 (N.C. Ct. App. Aug. 6, 2019) (dismissing claim for breach of the implied duty of good faith and fair dealing where attendant contract was deemed unenforceable: "[b]ecause Plaintiff cannot establish the existence of an enforceable contract, Plaintiff cannot state a claim that [defendant] 'somehow breached implied terms' of that contract." (quoting *Suntrust Bank v. Bryant/Sutphin Props., LLC*, 222 N.C. App. 821, 833, 732 S.E.2d 594, 603, *disc. review denied*, 366 N.C. 417, 735 S.E.2d 180 (2012)).

secrets. To the extent those alleged trade secrets constitute "confidential information" under the ICA, Aym's failure to offer facts showing misappropriation is likewise a failure to offer facts showing breach of the ICA. Thus, summary judgment should be entered dismissing Aym's breach of contract claim against Rodgers to this extent.

75. As for Aym's non-trade-secret "confidential information" under the ICA, Aym has not brought forward any evidence that Rodgers disclosed any such information to any third party, including to Scopia or CBC. All Aym offers in support is its contention that a factfinder could find breach based on Rodgers's admitted assistance to both of these Defendants and Aym in their separate efforts to acquire HCM are strained inferences from e-mails Rodgers sent to Scopia and Aym. (*See* Br. Opp'n Rodgers's Mot. Summ J. 8–10.) As explained above and discussed in further detail below, this purported evidence, which requires unwarranted speculative inferences, is insufficient to survive scrutiny under Rule 56.

76. First, the fact that Rodgers worked with Scopia, standing alone, is not evidence that Rodgers gave Scopia Aym's confidential information. *See InVue Sec. Prods., Inc.*, 2017 NCBC LEXIS 115, at *28; *Amerigas Propane, LP*, 2015 NCBC LEXIS 98, at *29–30, *35–36. Moreover, the e-mails on which Aym relies to demonstrate that Rodgers disclosed confidential information to Scopia do not permit the inferences Aym urges. For example, it is undisputed that on February 15, 2015, Rodgers e-mailed Scopia's Michael Somma ("Somma") stating that he "had some 'word' on the street gossip [sic] that someone will make [HCM] an offer this week," to

which Somma responded, "this is all helpful[.]" (Ex. 25 Wilder Aff., ECF No. 147.) Aym argues that a jury could conclude that because Rodgers quoted "word" in his e-mail, "Scopia was fully aware of Rodgers's involvement with Aym and that Rodgers . . . was signaling that this information came from Aym." (Br. Opp'n Rodgers's Mot. Summ J. 8–9.) Without more, however, Aym's requested inference from Rodgers's use of quotation marks around the word "word" is not grounded in fact and requires the Court to engage in impermissible speculation and conjecture. *See Willoughby v. Johnston Mem'l Hosp. Auth.*, Nos. COA15-832, COA15-833, COA15-834, 2016 N.C. App. Lexis 795, at *24–27 (N.C. Ct. App. Aug. 2, 2016) (affirming summary judgment for defendant where plaintiff could only speculate that defendant's breach of contract was the proximate cause of plaintiff's harm).

77. In a similar vein, Aym also claims that a jury could reasonably conclude that Rodgers used confidential information he obtained from Aym concerning Quinn's whereabouts because, after learning that Quinn would be out of town, Rodgers e-mailed Scopia's Wittels to inform him that HCM's owner, Whittington,

> has two "real offers" . . . [and that t]he offers are basically the same, and it will come down to "choosing" who takes care of the company. I do know the other entity is out of town so he's trying to buy some time, which I don't think we need to give him.

(Ex. 27 Wilder Aff., ECF No. 147.) Aym argues from this e-mail that Rodgers and Scopia used Quinn's confidential travel plans to their advantage by imposing a short deadline on HCM to consider Scopia's offer, thereby depriving Aym of the opportunity to react. (Br. Opp'n Rodgers's Mot. Summ J. 9–10.)

78. The undisputed facts show that Aym's contentions are without merit. First,

Aym offers no evidence that Quinn's travel plans were confidential and hence could not be disclosed by Rodgers. Next, although Quinn asked Rodgers to keep Aym's identity confidential until Aym had a viable acquisition deal, (Quinn Dep. Vol. I 22:16–19, 23:7–12), Rodgers did not disclose Aym's or Quinn's identity to Scopia in the cited e-mail and thus cannot be fairly accused through this evidence of disclosing to Scopia either Quinn's travel plans or Aym's interest in acquiring HCM. (*See* Ex. 27 Wilder Aff. (referring to Aym as "the other entity"); Ex. 38 Wilder Aff., ECF No. 147 (stating that Rodgers was "well known to the other bidders").)[6] But most importantly, the speculative inferences Aym seeks to draw from this e-mail are made impossible by the irrefutable evidence that Scopia imposed the offer response deadline four hours before Rodgers sent his e-mail to Wittels. (Ex. 27 Wilder Aff.) The undisputed timeline thus shows that Scopia could not have imposed the deadline as a result of Rodgers's e-mail as Aym submits. As a result, the Court concludes that Aym's requested inferences are not grounded in fact, require impermissible conjecture and speculation, and cannot be sustained under Rule 56.

79. For each of these reasons, therefore, the Court concludes that summary judgment should be entered dismissing Aym's breach of contract claim against Rodgers.[7]

---

[6] It is worth noting that Rodgers's use of "the other entity" and "other bidders" language in his e-mails suggests that he did not disclose Aym's identity to Scopia and certainly does not constitute evidence that he did.

[7] In light of the Court's ruling, the Court declines to consider Rodgers's additional arguments for dismissal.

## V.

## CONCLUSION

80.   **WHEREFORE**, for the foregoing reasons, the Court hereby **ORDERS** as follows:

a.  Aym's Motion to Supplement the Record is **GRANTED**, and ECF Nos. 151, 153, and 153.1 shall remain on the docket in the above-captioned case;

b.   Defendant Gene Rodgers's Motion for Summary Judgment is **GRANTED**, and all claims against Rodgers are hereby dismissed with prejudice; and

c.   Defendants Scopia Capital Management LP and Community Based Care, LLC's Motion for Summary Judgment is **GRANTED**, and all claims against Scopia and CBC are hereby dismissed with prejudice.

**SO ORDERED**, this the 16th day of October, 2019.


/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge